SANDISK CORPORATION'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT RE DAMAGES, EXHAUSTION, INVALIDITY, AND NONINFRINGEMENT

**PUBLIC REDACTED VERSION**

**Previously Filed as Docket 317**

CHUCK P. EBERTIN (SBN 161374)
  cebertin@velaw.com
VINSON & ELKINS LLP
1841 Page Mill Road, Suite 200-B
Palo Alto, CA  94304
Tel:  (650) 687-8200 / Fax: (650) 618-1970

CHARLES OSSOLA (*pro hac vice*)
  cossola@velaw.com
VINSON & ELKINS LLP
2200 Pennsylvania Avenue NW, Suite 500 West
Washington, DC  20037
Tel:  (202) 639-6500 / Fax: (202) 639-6604

CHRISTOPHER V. RYAN (*pro hac vice*)
  cryan@velaw.com
EFREN GARCIA (*pro hac vice*)
  egarcia@velaw.com
JANICE L. TA (*pro hac vice*)
  jta@velaw.com
VINSON & ELKINS LLP
2801 Via Fortuna, Suite 100
Austin, TX  78746
Tel: (512) 542-8400 / Fax: (512) 542-8612

DAVID J. TOBIN (*pro hac vice*)
  dtobin@velaw.com
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3700
Dallas, TX  75201
Tel:  (214) 220-7949 / Fax (214) 999-7949

Attorneys for Plaintiff and Counterclaim Defendant
SANDISK CORPORATION

**SUBMITTED UNDER SEAL (highlighted)**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDISK CORPORATION,<br><br>    Plaintiff and Counterclaim Defendant,<br><br>    vs.<br><br>ROUND ROCK RESEARCH LLC,<br><br>    Defendant and Counterclaim Plaintiff. | Case No. 3:11-cv-05243 RS<br><br>**SANDISK CORPORATION'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT RE DAMAGES, EXHAUSTION, INVALIDITY, AND NON-INFRINGEMENT**<br><br>Date:     April 25, 2014<br>Time:    1:30 p.m.<br>           Honorable Richard Seeborg |

# TABLE OF CONTENTS

**Page**

I.   ROUND ROCK IS NOT ENTITLED TO DAMAGES FOR ALLEGED INFRINGEMENT OF THE '791 PATENT PRIOR TO AUGUST 3, 2011 ........................... 1

A.   Legal and Factual Background ................................................................. 1

B.   The JEDEC Disclosures Are Legally Insufficient to Provide Actual Notice to SanDisk Under 35 U.S.C. § 287(a). .................................................. 2

II.   ROUND ROCK HAS NO EVIDENCE OF INFRINGEMENT OF CLAIM 1 OF THE '345 PATENT ........................................................................ 3

III.   SANDISK DOES NOT INFRINGE CLAIMS 1, 2, AND 4 OF THE '839 PATENT ............ 5

IV.   PATENT EXHAUSTION ELIMINATES SANDISK'S LIABILITY FOR ALLEGED INFRINGEMENT OF THE '791, '053, AND '345 PATENTS ............................... 6

A.   Legal and Factual Background ................................................................. 7

1.   SanDisk purchases memory from Toshiba entities which have an unrestricted, worldwide license to the '791, '053, and '345 Patents. ............... 7

B.   The Supreme Court Has Established that the Focus of Exhaustion/First Sale is Whether an Authorized Sale Took Place, Such That an Intellectual Property Owner Only Gets a Single Reward for a Particular Article. ........................ 8

1.   The "single-reward" principle underlies patent exhaustion. ........................... 8

2.   Patent exhaustion turns on whether the patent owner has authorized the sale of a product that substantially embodies a United States patent, and not where the sale took place. ................................................... 9

3.   The Supreme Court rejected geographic limitations to copyright "first sale" doctrine in order to limit a copyright owner to a single reward. ............. 10

C.   The Patentee Received Its Reward for the Patents-in-Suit, and the Authorized Sale from the Toshiba Entities to SanDisk Exhausts those Patents. .......................... 11

1.   *Jazz Photo* and *Ninestar* rely on the narrow *Boesch v. Graf* decision. ............ 12

2.   The *Jazz Photo* and *Ninestar* cases rely upon *Boesch v. Graf*, which did not involve an authorized sale under a United States patent. ................... 13

3.   *Boesch, Jazz Photo*, and *Ninestar* are inapplicable, because Micron authorized Toshiba's sales under a worldwide license to U.S. patents. ......... 14

a.   Other courts have directly addressed applying exhaustion to products sold overseas pursuant to a worldwide license. .................. 15

4.   Round Rock seeks to establish a system where a patentee can receive multiple rewards for an authorized sale, and where a patentee can impose post-sale restrictions on an unconditional license. ............................. 17

D.     The Accused Products Substantially Embody Claims of the Patents-In-Suit............. 18

V.     CLAIM 14 OF THE '791 PATENT IS INVALID FOR ANTICIPATION........................... 19

A.     Legal and Factual Background ....................................................................... 19

B.     Chen Invalidates Asserted Claim 14 of the '791 patent. ............................................. 20

1.     It is undisputed that Chen discloses "a processor." ........................................ 21

2.     Chen discloses "a double data rate flash memory coupled to the
processor." ...................................................................................................... 21

a.     Chen expressly discloses "double data rate . . . memory
coupled to the processor."................................................... 21

b.     There is no genuine dispute that Chen discloses "flash
memory" as one example of a DDR memory coupled to the
processor. ............................................................................. 22

3.     Chen expressly discloses an "array of non-volatile memory cells."............... 24

4.     Chen discloses "a clock signal connection to receive a clock signal."........... 24

5.     Chen discloses "control circuitry coupled to the array to provide two
data access operations per clock cycle."......................................................... 24

VI.    CONCLUSION................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Burke*,
84 U.S. (17 Wall.) 453 (1873) .................................................................. 9, 10, 14, 18

*Am. Calcar, Inc. v. Am. Honda Motor Co.*,
651 F.3d 1318 (Fed. Cir. 2011) ............................................................................. 23

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001) ............................................................................. 25

*Amsted Indus. Inc. v. Buckeye Steel Castings Co.*,
24 F.3d 180 (Fed. Cir. 1994) ........................................................................... 1, 2, 3

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
365 U.S. 336 (1961) .............................................................................................. 13

*Bloomer v. McQuewan*,
55 U.S. 539 (1852) .................................................................................................. 9

*Boesch v. Graf*,
133 U.S. U.S. 697 (1890) ...................................................................................... 13

*Boston Scientific Corp. v. Medtronic Inc.*,
No. 2011-1313, -1372 (Fed. Cir. Mar. 11, 2014) ................................................ 4, 5

*Curtiss Aeroplane & Motor Corp. v. United Aircraft Eng'g Corp.*,
266 F. 71 (2d Cir. 1920) ........................................................................................ 14

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
363 F.3d 1263 (Fed. Cir. 2004) ............................................................................. 20

*Freedman Seating Co. v. Am. Seating Co.*,
420 F.3d 1350 (Fed. Cir. 2005) ............................................................................... 4

*Fuji Photo Film Co., Ltd. v. Benun*,
463 F.3d 1252 (Fed. Cir. 2006) ....................................................................... 12, 13

*Fujifilm Corp. v. Benun*,
605 F.3d 1366 (Fed. Cir. 2010) ................................................................... 12, 13, 16

*Hobbie v. Jennison*,
149 U.S. 355 (1893) ........................................................................................ 9-10, 14

*Hoover Univ., Inc. v. Graham Packaging Corp.*,
No. CV-95-3331-KMW, 1997 WL 413600 (C.D. Cal. Apr. 17, 1997) .................... 3

*Impax Labs v. Aventis Pharms.*,
545 F.3d 1312 (Fed. Cir. 2008) ............................................................................. 24

*Innovus Prime, LLC v. Panasonic Corp.*,
No. C-12-006600-RMW, 2013 WL 3354390 (N.D. Cal. July 2, 2013) ................... 7

*Invitrogen Corp. v. Clontech Labs., Inc.*,
  429 F.3d 1052 (Fed. Cir. 2005) .................................................................................. 23

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
  430 F.3d 1377 (Fed. Cir. 2005) .................................................................................. 20

*Jazz Photo Corp. v. Int'l Trade Comm'n*,
  264 F.3d 1094 (Fed. Cir. 2001) ............................................................................. 12, 13

*Keeler v. Standard Folding-Bed Co.*,
  157 U.S. 659 (1895) ................................................................................ 10, 11, 14, 18

*Kirtsaeng v. John Wiley & Sons, Inc.*,
  568 U.S. ---, 133 S. Ct. 1351 (2013) ..................................................... 10, 11, 16, 18

*LifeScan Scot., Ltd. v. Shasta Techs., LLC*,
  734 F.3d 1361 (Fed. Cir. 2013) ............................................................................. 10, 11

*LG Elecs., Inc. v. Hitachi, Ltd.*,
  655 F. Supp. 2d 1036 (N.D. Cal. 2009) ............................................................. 12, 15, 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .................................................................................................. 20

*Medimmune, LLC v. PDL BioPharma, Inc.*,
  No. C 08-5590 JF (HRL), 2011 WL 61191 (N.D. Cal. Jan. 7, 2011) ......................... 16

*MEHL/Biophile Int'l Corp. v. Milgraum*,
  192 F.3d 1362 (Fed. Cir. 1999) .................................................................................. 25

*Multimedia Patent Trust v. Apple, Inc.*,
  No. 10-CV-2618-H (KSC), 2012 WL 6863471 (S.D. Cal. Nov. 9, 2012) ......... 16, 17, 18

*Nike, Inc. v. Wal-Mart Stores, Inc.*,
  138 F.3d 1437 (Fed. Cir. 1998) .................................................................................... 1

*Ninestar Tech. Co., Ltd. v. Int'l Trade Comm'n*,
  667 F.3d 1373 (Fed. Cir. 2012), *pet. for cert. denied*, 113 S. Ct. 1656 (Mar. 25, 2013).... 12, 13, 15

*Novartis Corp. v. Ben Venue Labs., Inc.*,
  271 F.3d 1043 (Fed. Cir. 2001) .................................................................................... 5

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
  553 U.S. 617 (2008) ........................................................................................... *passim*

*Sanofi, S.A. v. Med-Tech Veterinarian Prods., Inc.*,
  565 F. Supp. 931 (D.N.J. 1983) ................................................................................. 16

*STMicroelectronics, Inc. v. SanDisk Corp.*,
  No. 4:05cv45, 2007 WL 951655 (E.D. Tex. Mar. 27, 2007) ....................................... 16

*Tessera, Inc. v. Int'l Trade Comm'n*,
  646 F.3d 1357 (Fed. Cir. 2011) .................................................................................. 10

*U.S. v. Masonite Corp.*,
   316 U.S. 265 (1942) ................................................................................................ 7, 9, 17

*U.S. v. Univis Lens*,
   316 U.S. 241 (1942) .................................................................................................... 9, 17


**Statutes**

35 U.S.C. § 102(e) ............................................................................................................ 20

35 U.S.C. § 287(a) ........................................................................................................... 1, 2

**Other Authorities**

*Model Patent Jury Instr. for the N.D. of Cal.* ..................................................................... 4

1

**NOTICE OF MOTION AND MOTION**

2       PLEASE TAKE NOTICE that on April 25, 2014 at 1:30 p.m., or as soon thereafter as this

3  matter may be heard before the Honorable Richard Seeborg of the United States District Court for

4  the Northern District of California, there will be a hearing on the following motion for summary

5  judgment filed by Plaintiff and Counterclaim Defendant SanDisk Inc. ("SanDisk").

6

**MEMORANDUM OF POINTS AND AUTHORITIES**

7  **I.     ROUND ROCK IS NOT ENTITLED TO DAMAGES FOR ALLEGED
8          INFRINGEMENT OF THE '791 PATENT PRIOR TO AUGUST 3, 2011**

9          **A.     Legal and Factual Background**

10      A patentee who fails to meet its affirmative burden to demonstrate compliance with the

11  marking statute may not recover damages "except on proof that the infringer was notified of the

12  infringement and continued to infringe thereafter, in which event damages may be recovered only

13  for infringement occurring after such notice."  35 U.S.C. § 287(a); *Nike, Inc. v. Wal-Mart Stores,*

14  *Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998).  The "notice must be an affirmative act on the part of the

15  patentee which informs the defendant of his infringement."  *Amsted Indus. Inc. v. Buckeye Steel*

16  *Castings Co.*, 24 F.3d 180, 187 (Fed. Cir. 1994).  The Federal Circuit interprets this requirement

17  strictly, requiring that the notice must be an "affirmative communication of a specific charge of

18  infringement by a specific accused product or device."  *Id.*

19      As admitted by the lead inventor of United States Patent No. 6,570,791 ("the '791 Patent"),

20  Micron did not mark any of its products with patent numbers.  [Ex. 1 (Roohparvar Dep. Tr.) at

21  83:10–84:9, 292:17–293:3.][1]  Similarly, Round Rock has licensed the '791 patent to numerous

22  companies as part of its portfolio, yet has no evidence that it imposed any marking requirements on

23  its licensees.  [Ex. 2 (Round Rock website).]  To avoid further discovery as to marking obligations,

24  counsel for Round Rock and Micron "stipulate[d] that Round Rock is not seeking pre-notice

25  damages on the '791 and '053 patents."  [Ex. 3 (9/13/2013 E-mail from R. Cowell).]  Therefore,

26  Round Rock may only seek damages from the date upon which it provided actual notice of

27  infringement to SanDisk.  *See* 35 U.S.C. § 287(a).

28  _____
[1]  The exhibits cited herein refer to those attached to the Declaration of David J. Tobin in Support of SanDisk's Motion for Summary Judgment.

**B.      The JEDEC Disclosures Are Legally Insufficient to Provide Actual Notice to SanDisk Under 35 U.S.C. § 287(a).**

Round Rock contends that SanDisk was notified of the '791 patent either on August 3, 2011, or July 15, 2009.  [*See, e.g.,* Ex. 4 (Wagner Rept.) at p. 124 ¶ 415.]  As a matter of law, Round Rock cannot establish actual notice on any date prior to August 3, 2011.  Round Rock's sole basis for alleging actual notice before August 3, 2011 is its technical expert's assertions that SanDisk had knowledge of the '791 patent as of July 15, 2009, because a few SanDisk employees "who were subscribed to the JEDEC jc40 and j64 (and other JEDEC) email distribution lists received [on that date] an email and attachments" labeled as Exhibits 1269–75 (collectively, "JEDEC Disclosures").  [*See* Ex. 5 (Zeidman Opening Rept.) at p. 36 ¶ 100.]

These JEDEC Disclosures do not satisfy the strict requirements of 35 U.S.C. § 287(a) because they are open letters to the JEDEC standards setting group, which is comprised of more than 50 companies, and are sent to all recipients on the listserv.  [*See* Exs. 1269–75.]  The letters do not provide actual notice because they do not refer to any products, nor do they allege that any products infringe any patent claim. As Round Rock's own expert concedes, the JEDEC Disclosures neither identify any specific SanDisk products nor even refer to SanDisk.  [Ex. 6 (Zeidman Dep. Tr.) at 304:13–16, 306:4–9.]  Furthermore, the JEDEC Disclosures do not allege infringement of the '791 patent, but instead identify numerous Micron patents and then commit "to license any party under the patent rights."  [*See, e.g.,* Exs. 1270, 1271, 1274, 1275.]  These letters are "merely informational, of the kind that companies often send to others without intending to charge infringement.  Just as such letters tend not to be threats sufficient to justify a declaratory judgment action, they also are not charges of infringement for 'notice' purposes."  *Amsted*, 24 F.3d at 186, 187 (finding "letter . . . broadcast to a number of other companies" to be insufficient notice under § 287(a) when the letter instructed the companies to "acquaint yourself with the [patent] and refrain from supplying or offering to supply component parts which would infringe or contribute to the infringement of the patent").  The JEDEC Disclosures do not even suggest infringement, let alone provide a "specific charge of infringement by a specific accused product or device," and accordingly do not provide actual notice.  *Id.* at 187 ("[N]otice must be of 'the infringement,' not merely notice of the patent's existence or ownership").

Unable to identify any person at SanDisk who actually "knew that any SanDisk product infringed the '791 patent," Round Rock's expert argues that the persons on "that JEDEC list should have known" that they were infringing.  [Ex. 6 (Zeidman Dep. Tr.) at 286:22–287:7.]  This theory "is irrelevant," because it does not "focus on the action of the patentee."  *Amsted*, 24 F.3d at 187.

> To hold otherwise would be to read the statute to say: "[D]amages may be recovered for infringement occurring after the infringer is, ***or should have been***, ***aware*** of such infringement." This is not the law. The statutory requirement of "notice" is unambiguous. There can be no recovery for the period before the defendant is expressly notified by the particular patentee that it is infringing a particular patent.

*Hoover Univ., Inc. v. Graham Packaging Corp.*, No. CV-95-3331-KMW, 1997 WL 413600, at *2 (C.D. Cal. Apr. 17, 1997) (quoting *Amsted*, emphasis altered).  Because Round Rock's only evidence before August 3, 2011 is legally insufficient to constitute actual notice, Round Rock is not entitled to seek damages before August 3, 2011.

## II.   ROUND ROCK HAS NO EVIDENCE OF INFRINGEMENT OF CLAIM 1 OF THE '345 PATENT

Claim 1 of U.S. Patent Nos. 5,682,345 ("the '345 patent") recites three separate means-plus-function limitations: "program means," "recall means," and "load means."  [Dkt. No. 167 at 16–19; Dkt. No. 179.]  The Court construed each of these terms to require not just any set of transistors, but specific sets of transistors and connections between those transistors.  [*Id.*]  For example, the Court construed "program means" to require "transistors 16, 20, 24, and 26 and the shared control wire, and equivalents thereof"; "recall means" to require "a pair of transistors connected between the non-volatile memory and the corresponding halves of the volatile memory latch 12, and equivalents thereof"; and "load means" to require "a pair of transistors coupled between data inputs and corresponding inputs of the volatile memory latch and equivalents thereof."  [*Id.*]

Round Rock's technical expert focused on the "function" aspect of the means-plus-function claims but ignored the "structure" requirement.  Indeed, his opinion is that he "can analyze only the functionality and the fact that it has transistors so I believe that infringes."  [Ex. 6 (Zeidman Dep. Tr.) at 208:10–13; *see also id.* at 210:3–10; Ex. 7 (Zeidman Opening Rept.) at Exhibit E pp. 31, 32 (arguing that whatever circuitry and transistors SanDisk has is "likely equivalent" to the claimed structure because "SanDisk's circuitry is transistor-based and performs the same function").]

1   Indeed, he admits that he did not "undertake a full analysis of whether those [accused] products

2   contain equivalent structures that fulfill the load means, program means, and recall means elements

3   of claim 1." [Ex. 8 (Zeidman Reply Rept.) at p. 9 ¶ 34.]

4        Round Rock's expert based his analyses on the repeated assertion that in "the accused

5   products, that circuitry consists of transistors," [*see* Ex. 7 (Zeidman Opening Rept.) at Exhibit E

6   pp. 31, 32], but that says nothing about infringement.  Mr. Zeidman does not point to any specific

7   transistors or connections between transistors in the accused products, as required by the Court's

8   constructions.  *See Boston Scientific Corp. v. Medtronic Inc.*, No. 2011-1313, -1372, Slip op. at 4

9   (Fed. Cir. Mar. 11, 2014) (rejecting "vague perfunctory language" in expert report).  Mr. Zeidman

10  does not identify which components in the accused products fulfill the requirement of "transistors

11  16, 20, 24, and 26"; he does not identify any component as a "shared control wire," and he does not

12  identify any components that constitute "volatile memory latch 12" (and does not even identify any

13  "latch").  [*See* Ex. 7.]  Further, Mr. Zeidman does not analyze the differences between SanDisk's

14  products and the claimed structure, nor does he show that a person of ordinary skill in the field

15  would have considered those differences to be insubstantial.  Last, Mr. Zeidman fails to demonstrate

16  that the (unidentified) structure in the SanDisk products was available on the date the '345 patent

17  was granted.  Because Mr. Zeidman has ignored the corresponding structure required by the Court's

18  constructions, Round Rock has failed to demonstrate infringement.  *See Freedman Seating Co. v.*

19  *Am. Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir. 2005) (it is well established that "an accused

20  product or process is not infringing unless it contains each limitation of the claim, either literally or

21  by an equivalent"); *see also Model Patent Jury Instr. for the N.D. of Cal.* at 18–19 (describing the

22  requirements to prove infringement of means-plus-function limitations).

23       Mr. Zeidman seeks to excuse his failure of proof by foisting his burden upon SanDisk,

24  blaming SanDisk for failing to "provide[ ] schematics or RTL code for the accused products."

25  [Ex. 7 (Zeidman Opening Rept.) at Exhibit E pp. 31, 32.]  However, SanDisk did produce RTL code

26  to Round Rock [Ex. 9], yet even as late as his deposition (February 12, 2014), Round Rock chose not

27  to share any of the RTL code it received with Mr. Zeidman.  [Ex. 6 (Zeidman Dep. Tr.) at 208:14–

28  17, 210:15–211:2.]  More importantly, infringement is Round Rock's burden, and Mr. Zeidman

1    should not be allowed to ignore the Court's claim construction because his counsel failed to give him

2    the documents he wanted.  *See Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed.

3    Cir. 2001) ("Since the ultimate burden of proving infringement rests with the patentee, an accused

4    infringer seeking summary judgment of noninfringement may meet its initial responsibility either by

5    providing evidence that would preclude a finding of infringement, or by showing that the evidence

6    on file fails to establish a material issue of fact essential to the patentee's case"); *Boston Scientific*,

7    No. 2011-1313, -1372, Slip op. at 4 (confirming that in the context of a declaratory judgment action,

8    the patentee's expert has "the requirement to opine on the presence of structure meeting every claim

9    limitation").

10   **III.    SANDISK DOES NOT INFRINGE CLAIMS 1, 2, AND 4 OF THE '839 PATENT**

11       Claim 1 of U.S. Patent No. 6,383,839 ("the '839 patent") recites "forming a plurality of bond

12   pads on said semiconductor device, adjacent a single edge thereof," and claims 2 and 4 depend from

13   claim 1.  [Dkt. No. 142-1 ('839 patent) at 5:64–67.]  The Court construed that phrase to require that

14   the bond pads be "adjacent **only** one edge." [Dkt. No. 167 at 15–16 (emphasis added).]  The Court

15   reasoned that "absent the word 'only,' a chip with bond pads and leads along one edge would satisfy

16   the claim even if it *also* had leads and bond pads along another edge."  [*Id.* at 16.]  "Round Rock,

17   however, expressly disavow[ed] any intent to argue that a chip with leads and bond pads situated

18   along multiple edges is within the scope of the claim," and the Court agreed that "such a chip would

19   be outside the scope of this claim."  [*Id.* at 15–16.]

20       Under the Court's construction, the accused SanDisk products do not infringe because bond

21   pads on the accused microSD cards ████████████████████████████████████████████████

22   ████████████████████    "Below is a bonding diagram for an exemplary microSD card utilizing a

23   ██████   controller and a single memory chip.  The controller is illustrated in green and the memory

24   chip is illustrated in yellow."  [Declaration of Ron Maltiel, Ex. B (Rebuttal Rept.) at 113 ¶ 250.]

25

26

27

28



[*Id.* at 114 (further annotated to insert labels and arrows).]  As can be seen, ████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████  [*Id.* at 115 ¶ 250.]  ████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████  [Ex. 10 (Afromowitz Dep. Tr.) at
92:18–19.]  ██████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████  [*Id.*
at 92:20–24.]  ███████████████████████████████████████████████████████
█████████████████████████, SanDisk does not infringe claims 1, 2, or 4 of the '839 patent.

## IV.    PATENT EXHAUSTION ELIMINATES SANDISK'S LIABILITY FOR ALLEGED INFRINGEMENT OF THE '791, '053, AND '345 PATENTS

Summary judgment is warranted as to SanDisk's patent exhaustion defense with regard to three of the four remaining patents-in-suit: the '791 patent, the '345 patent, and 6,845,053 ("the '053 patent").  The material facts are not in genuine dispute.  First, SanDisk buys its flash memory chips from Toshiba

entities[2] that are authorized to make such sales pursuant to a worldwide license with Micron ███████ ███████████████████████████████████████████████████. As Micron's assignee, Round Rock "steps into the shoes with regard to the rights that the assignor [Micron] held and not in an expansion of those rights." *Innovus Prime, LLC v. Panasonic Corp.*, No. C-12-006600-RMW, 2013 WL 3354390, at *5 (N.D. Cal. July 2, 2013) (explaining the "longstanding principle that an assignee of a patent takes the patent subject to prior licenses"). Second, there is no reasonable dispute that the flash memory chips purchased by SanDisk substantially embody claims from the three patents-in-suit.

Round Rock's primary attack on SanDisk's patent exhaustion defense is that SanDisk buys its flash memory chips outside the United States. Even though the Toshiba entities have already compensated the patent holder for the unrestricted right under the patents-in-suit ███████ ███████████████ of flash memory chips ***anywhere in the world***, Round Rock contends that customers of the Toshiba entities must separately pay the patent holder when the Toshiba entities exercise their rights under those patents. It is precisely this form of "double dipping" that the patent exhaustion doctrine was designed to prevent.

### A.    Legal and Factual Background

"The authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control postsale use of the article." *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 638 (2008). An unrestricted sale of a product covered by a patent exhausts the patent holder's right to control use of that item thereafter because the patentee has bargained for and received full value for the good. *See U.S. v. Masonite Corp.*, 316 U.S. 265, 278 (1942) ("The test has been whether or not . . . it may fairly be said that the patentee has received his reward for the use of the article.").

### 1.    SanDisk purchases memory from Toshiba entities which have an unrestricted, worldwide license to the '791, '053, and '345 Patents.

Before Micron transferred the patents-in-suit to Round Rock [*see* Dkt. No. 108], Micron and

---

[2] ████████████████████████████████████████████████████████████ In this motion, Toshiba Corp. and its majority-owned subsidiaries shall be collectively referred to as "Toshiba entities." [*See* Dkt. No. 132 (SanDisk's Opp. to Mot. for Summ. J.) at 5:13–6:15 and accompanying exhibits (describing relationship between Toshiba Corporation and its subsidiaries, and the process by which SanDisk purchases products).]

Toshiba executed a license agreement, whereby:

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████

[*See* Dkt. No. 133, Ebertin Decl. Ex. 24 (Micron-Toshiba License) at § 3.1 (emphases added).]
██████████████████████████████ [*Id.* at §§ 1.4–1.6, 1.11; *see also* Ex. 11 (Westergard Dep. Tr.) at 118:1–120:9.] ███████████████████████████████████████
███████████████████████ [*Id.* at §§ 1.13, 1.14 (emphasis added).] ███████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
[Ex. 12 (Wagner Dep. Tr.) at 232:14–24; *see also id.* at 22:13–23:8.][3]  Therefore, there is no dispute that flash memory sold by the Toshiba entities is licensed under the '791, '053, and '345 patents.

SanDisk purchases that licensed memory from the Toshiba entities, which import, export, sell and manufacture or cause to be manufactured the flash memory chips overseas at various factories in Japan.  [*See* Dkt. No. 132 (SanDisk's Opp. to Mot. for Summ. J.) at 5:13–6:15 and accompanying exhibits (describing process by which SanDisk purchases memory).]  Because the chips are covered by the worldwide Micron-Toshiba license, their authorized sale to SanDisk exhausts Round Rock's patent rights. The patent holder has already been compensated for the patents-in-suit as to the purchased flash memory chips and should not be compensated a second time under the same patents for the same flash memory chips.

**B.    The Supreme Court Has Established that the Focus of Exhaustion/First Sale is Whether an Authorized Sale Took Place, Such That an Intellectual Property Owner Only Gets a Single Reward for a Particular Article.**

**1.    The "single-reward" principle underlies patent exhaustion.**

The "decisions [of the Supreme Court] have uniformly recognized that the purpose of the

---

[3] ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████

patent law is fulfilled with respect to any particular article when the patentee has received his reward for the use of his invention by the sale of the article, and that once that purpose is realized the patent law affords no basis for restraining the use and enjoyment of the thing sold." *U.S. v. Univis Lens*, 316 U.S. 241, 251 (1942). The Supreme Court further explained that "[t]he test has been whether or not there has been such a disposition of the article that it may fairly be said that the patentee has received his reward for the use of the article." *Masonite*, 316 U.S. at 278. More recently, the Supreme Court reaffirmed this single-reward policy underlying patent exhaustion:

> This case illustrates the danger of allowing such an end-run around exhaustion. On LGE's theory, although Intel is authorized to sell a completed computer system that practices the LGE Patents, any downstream purchasers of the system could nonetheless be liable for patent infringement. Such a result would violate the longstanding principle that, when a patented item is "once lawfully made and sold, there is no restriction on [its] use to be implied for the benefit of the patentee."

*Quanta*, 553 U.S. at 630 (quoting *Adams v. Burke*, 84 U.S. (17 Wall.) 453, 457 (1873)).

### 2. Patent exhaustion turns on whether the patent owner has authorized the sale of a product that substantially embodies a United States patent, and not where the sale took place.

"The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item." *See Quanta*, 553 U.S. at 625. One of the cases relied upon by the *Quanta* Court was *Adams v. Burke*, in which the patent holder had licensed a carpenter to make and sell coffin lids, but only within ten miles of Boston. *Adams*, 84 U.S. at 456–57. The carpenter-licensee made an authorized sale—i.e., a sale within ten miles of Boston—of a coffin lid to an undertaker, who then transported the lid beyond the ten-mile radius and put it to use. *Id.* The Court denied the patent owner's attempt to collect a second royalty from the undertaker for using the coffin lid outside of the carpenter's sales region, because "so far as the use of it was concerned, the patentee had received his consideration, and it was no longer within the monopoly of the patent." *Id.* at 456; *see also Bloomer v. McQuewan*, 55 U.S. 539, 549 (1852) ("[W]hen the machine passes to the hands of the purchaser, it is no longer within the limits of the monopoly").

The Supreme Court has focused on whether a sale is authorized under a United States patent, as opposed to the location of the sale. For example, the Court in *Hobbie v. Jennison* found exhaustion involving pipe purchased in Michigan but used in Connecticut, outside the licensee's

sales region.  149 U.S. 355, 362–633 (1893) (reading *Adams v. Burke* to stand for the proposition "that the patentee, or his assignee, having in the act of sale received all the royalty or consideration which he claims for use of his invention in that particular machine or instrument, it is ***open to the use of the purchaser without further restriction*** on account of the monopoly of the patentee" (emphasis added)).  In another case involving sales regions subdivided by geography, the Supreme Court stated that "we think it follows that one who buys patented articles of manufacture from one authorized to sell them becomes possessed of an absolute property right in such articles, ***unrestricted in time or place***."  *Keeler v. Standard Folding-Bed Co.*, 157 U.S. 659, 666 (1895) (emphasis added) (summarizing *Adams*, *Hobbie*, and other cases).  In each of these Supreme Court cases, the Court found that exhaustion depended upon and was triggered by whether the patent owner authorized the sale of particular articles under a United States patent and whether the patentee had already been compensated for those articles.  *See Quanta*, 553 U.S. at 630–31 (using exhaustion to prevent patent holder from "extend[ing] their rights through each downstream purchaser all the way to the end user"); *Tessera, Inc. v. Int'l Trade Comm'n*, 646 F.3d 1357, 1369–70 (Fed. Cir. 2011) ("The proper focus is on whether the sales were authorized").

### 3.   The Supreme Court rejected geographic limitations to copyright "first sale" doctrine in order to limit a copyright owner to a single reward.

In *Kirtsaeng*, the Supreme Court addressed the issue of whether "the buyer [of a book manufactured and sold abroad], like the buyer of a domestically manufactured copy, [is] free to bring the copy into the United States and dispose of it as he or she wishes."  *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. ---, 133 S. Ct. 1351, 1355 (2013).  The Court held in the affirmative, that the "'first sale' doctrine applies to copies of a copyrighted work lawfully made abroad."  *Id.* at 1356.  The rationale provided by the Supreme Court regarding the copyright "first sale" doctrine is instructive to patent exhaustion, because both doctrines stem from common law and involve similar underlying policies. *LifeScan Scot., Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1375 n.9 & 1376 (Fed. Cir. 2013) (finding *Kirtsaeng* instructive for patent exhaustion because the "Supreme Court has frequently explained that copyright cases inform similar cases under patent law," and noting the "common policies underlying patent exhaustion and the [copyright] first sale doctrine").  In analyzing the *Kirtsaeng* decision, the

Federal Circuit recognized that "copyright's first sale doctrine, unlike patent exhaustion, has been codified by statute." *LifeScan*, 734 F.3d at 1376. Nevertheless, the Federal Circuit explained that the copyright analysis was instructive because "the Supreme Court looked to the doctrine's common law roots to interpret that [statutory] provision. *Kirtsaeng*, 133 S. Ct. at 1363 ("The 'first sale' doctrine is a common-law doctrine with an impeccable historic pedigree.")." *LifeScan*, 734 F.3d at 1376.

In reviewing the common law, the *Kirtsaeng* Court reasoned that "a geographical limitation [to first-sale] was previously lacking" in the copyright statute, and that the statute did not act to impose such a geographic limitation. *See Kirtsaeng*, 133 S. Ct. at 1360. Similarly, the Supreme Court determined that patent exhaustion—which is not codified by statute and therefore not restricted—is "unrestricted in time or place." *Keeler*, 157 U.S. at 666. Much like the "authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control postsale use of the article," *Quanta*, 553 U.S. at 638, "the very basic concept of copyright law [is] that, once you've sold a copy legally, you can't restrict its resale." *Kirtsaeng*, 133 S. Ct. at 1363.

**C.     The Patentee Received Its Reward for the Patents-in-Suit, and the Authorized Sale from the Toshiba Entities to SanDisk Exhausts those Patents.**

As described above, Micron and Toshiba entered into a worldwide portfolio cross-license. Micron granted Toshiba unconditional worldwide rights to Micron's patents (including its United States patents). In return, Micron received ████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████ [Ex. 11 (Westergard Dep. Tr.) at 117:15–118:11, 126:10–23; *see also id.* at 129:15–130:19.] Nonetheless, Round Rock now seeks a reading of patent law that would allow it to sue downstream customers of Toshiba entities simply because the licensed products were sold in Japan before they traveled to the United States. Although the Toshiba entities undisputedly have an ███████████████████████████████████████████ flash memory anywhere in the world, Round Rock takes the litigation position that those activities are prohibited to the Toshiba entities unless they ship licensed products directly to the United States before selling them to their customers. Thus, under Round Rock's view of patent exhaustion, Round Rock could sue Toshiba for inducing

1   infringement of the patents-in-suit based on Toshiba's sale of flash memory chips to a customer in

2   Japan and the customer's subsequent importation of those chips into the United States, even though

3   Toshiba already compensated Round Rock's predecessor for the unrestricted right to sell and import

4   those chips anywhere in the world. As a result, Round Rock seeks to impose post-sale restrictions on the

5   unrestricted, worldwide license that its predecessor to the patents-in-suit granted the Toshiba entities.

6   *But see Quanta*, 553 U.S. at 638 ("The authorized sale of an article that substantially embodies a patent

7   exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control

8   postsale use of the article.").

9       **1.**    ***Jazz Photo* and *Ninestar* rely on the narrow *Boesch v. Graf* decision.**

10           Round Rock rationalizes the post-sale restriction it is trying to place on the Micron-Toshiba

11   License by relying on the *Jazz Photo* progeny of cases[4] and *Ninestar*[5] to argue that patent exhaustion

12   "applies only to products first sold in the United States—not to products purchased by an alleged

13   infringer outside the United States that are imported into and/or resold in the United States." [Dkt.

14   No. 123 at 7:1–3.] But Round Rock's reliance on these factually dissimilar cases is misplaced, as

15   they do not stand for the absolute proposition that Round Rock advocates.

16           The *Jazz Photo* line of cases involved a series of patent infringement lawsuits brought by Fuji

17   against Jazz Photo, Mr. Benun, and other accused infringers, relating to refurbishing single-use

18   cameras. *See generally Jazz Photo I*, 264 F.3d at 1094. "The primary issue was whether the

19   refurbishment constituted repair (which is permitted under the patent laws) or reconstruction (which is

20   not)." *LG Elecs., Inc. v. Hitachi, Ltd.*, 655 F. Supp. 2d 1036, 1045 (N.D. Cal. 2009) (reviewing *Jazz*

21   *Photo I* and *Jazz Photo II*). The Federal Circuit examined the activities of the accused infringers—

22   specifically the various steps used to refurbish the single-use cameras—and determined that certain

---

[4]   The *Jazz Photo* line of cases includes *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094 (Fed. Cir. 2001) ["*Jazz Photo I*"]; *Fuji Photo Film Co., Ltd. v. Benun*, 463 F.3d 1252 (Fed. Cir. 2006) ["*Jazz Photo II*"]; and *Fujifilm Corp. v. Benun*, 605 F.3d 1366 (Fed. Cir. 2010) ["*Jazz Photo III*"]. Each of these cases involved substantially the same set of facts in a protracted series of litigation over refurbished instant cameras.

[5]   In *Ninestar*, the Federal Circuit tersely summarized the *Jazz Photo* cases and then found the continued violation of an ITC general exclusion order to be "egregious" and in bad faith for importing products through the "manipulation of transaction dates . . . misdescriptions of the cartridges [and] fil[ing] false affidavits." *Ninestar Tech. Co., Ltd. v. Int'l Trade Comm'n*, 667 F.3d 1373, 1377–79 (Fed. Cir. 2012), *pet. for cert. denied*, 113 S. Ct. 1656 (Mar. 25, 2013).

steps constituted permissible repair and not prohibited reconstruction.  *Jazz Photo I*, 264 F.3d at 1101, 1105–1101.  This dichotomy implicates the doctrine of patent exhaustion because it affects the post-sale rights of subsequent purchasers of a licensed product.  If a product is lawfully sold, then the purchaser and all subsequent purchasers possess authority to repair it.  *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 346 (1961).  Reconstructions, however, constitute a second copy that can exceed the rights that accompany an initial sale and are not allowed under U.S. patent law.  *See id.* at 342–343.  In deciding the repair/reconstruction issue, the Federal Circuit in *Jazz Photo I* commented that the repair doctrine was not applicable for refurbished cameras whose outer shells had not been originally sold in the United States, because "United States patent rights are not exhausted by products of foreign provenance."  264 F.3d at 1105.  But to support this statement, the Federal Circuit cited only one case—*Boesch v. Graf*.  Subsequent *Jazz Photo* and *Ninestar* decisions also rely on *Boesch v. Graf* to hold that *Quanta* "did not eliminate the first sale rule's territoriality requirement."  *Jazz Photo II*, 463 F.3d at 1376; *see also Jazz Photo III*, 605 F.3d at 1371; *Ninestar*, 667 F.3d at 1378.

### 2. The *Jazz Photo* and *Ninestar* cases rely upon *Boesch v. Graf*, which did not involve an authorized sale under a United States patent.

*Boesch v. Graf* does not stand for the proposition that overseas sales can never be the basis for exhaustion.  Rather, the Court declined to find exhaustion because the patent owner did not authorize the sale under the United States patent (or any patent, for that matter).  The patent owner in that case held patents in both the United States and Germany for certain lamp components, but a third-party individual in Germany held a prior-use right under German law to *only* the German patent.  *Boesch v. Graf*, 133 U.S. U.S. 697, 701 (1890).  The accused infringer purchased lamp components from that third party in Germany, incorporated them into lamps, and sold the lamps in the United States.  *Id.*  The Supreme Court held that the sale by the unauthorized individual with prior-use rights to the German patent did not exhaust rights to the United States patent because the sale—in contrast to the facts in this case—was "without the license or consent of the owners of the United States" patent.  *Id.* at 702–703; *but see Jazz Photo I*, 264 F.3d at 1105 (relying on *Boesch v. Graff* for the proposition that "a lawful foreign purchase does not obviate the need for license from the United States patentee before importation into and sale in the United States").  Subsequently, the

Supreme Court reconciled the no-exhaustion holding in *Boesch* with other Supreme Court cases that did find exhaustion, by recognizing that *Boesch* presented a narrow fact pattern:

> *Boesch v. Graff* . . . is not out of line with the previous cases. The exact question presented was whether a dealer residing in the United States could purchase in another country articles patented there from a person authorized there to sell them, ***and import them to and sell them in the United States without the license or consent of the owners of the United States patent***, and the court held that the sale of articles in the United States under a United States patent cannot be controlled by foreign laws. In this case ***neither the patentee or any assignee had ever received any royalty or given any license to use the patented article in any part of the United States***.

*Keeler*, 157 U.S. at 664–665 (emphasis added).  The *Keeler* Court understood its prior precedent (including *Boesch*) to collectively hold that "one who buys patented articles of manufacture from one ***authorized to sell*** them becomes possessed of an absolute property right in such articles, ***unrestricted in time or place***." *Id.* at 666.

### 3. *Boesch*, *Jazz Photo*, and *Ninestar* are inapplicable, because Micron authorized Toshiba's sales under a worldwide license to U.S. patents.

The present case is distinguishable not only from *Boesch*, but also from *Jazz Photo* and *Ninestar*.  Unlike the Supreme Court decisions finding exhaustion because the first sale was authorized under a United States patent—e.g., *Adams* and *Hobbie*—the *Boesch* Court found the first sale was ***not*** authorized under a United States patent. In *Boesch*, the patentee did not make the sale abroad, nor did its licensee make that sale.  Rather, the seller was one who had no license under any patents, but instead had a right to sell under the German patent only because of prior-use rights under German law.  *Boesch*, 133 U.S. at 701. Under the narrow circumstances of *Boesch*, the patentee did not receive any compensation for the use of his invention in any country (let alone the United States), nor did he consent to its importation into the United States.  *See, e.g.*, *Curtiss Aeroplane & Motor Corp. v. United Aircraft Eng'g Corp.*, 266 F. 71, 77 (2d Cir. 1920) (summarizing the facts of *Boesch* as "no participation whatsoever by the owner of the patent, either as a party or as a privy, in the putting out of the article which is alleged to infringe."); *Keeler*, 157 U.S. at 664–665 (discussing the "exact question presented" in the *Boesch* decision).  In contrast, Micron licensed its United States patents, received compensation for the use of its inventions in all countries of the world (including the United States) under each of the patents-in-suit, and even agreed that the Toshiba

entities ██████████████████████████████████████████

████████████████  [*See* Dkt. No. 133, Ebertin Decl. Ex. 24 (Micron-Toshiba License) at § 3.1.]

Thus, in contrast to the *Boesch* decision, the sale of flash memory products from the Toshiba entities

to SanDisk is with "the license [and] consent of the owners of the United States patent."

The *Jazz Photo* progeny and *Ninestar* cases are distinguishable not just because they rely on

the *Boesch* decision, but also because they address different issues from those in the present dispute.

In *Jazz* photo, the Federal Circuit focused on the repair versus reconstruction issue.  In *Ninestar*, the

issue before the court was whether a penalty should be imposed upon the accused infringer for

continuing to import goods in violation of an ITC general exclusion order and cease and desist order.

667 F.3d at 1376–77.  In *Ninestar*, the violation of the orders were "egregious" and in bad faith for

importing products through the "manipulation of transaction dates . . . misdescriptions of the

cartridges [and] fil[ing] false affidavits."  *Id.* at 1377–79.  In the *Jazz Photo* and *Ninestar* cases, the

Federal Circuit was not required to directly address the implications of an overseas sale where the

seller had an unconditional worldwide license ███████████████████████████

██████████████████████████████ of the products.

> a.   **Other courts have directly addressed applying exhaustion to products sold overseas pursuant to a worldwide license.**

Other district courts who have directly addressed the central issue here have concluded that

patent exhaustion applies. For example, this Court held that because Intel's overseas sales to Hitachi

were "specifically authorized by [a] *worldwide* license agreement," the sales "fall squarely within

the ambit of *Quanta*" and patent exhaustion applies.  *LG Elecs.*, 655 F. Supp. 2d at 1044.  This Court

further explained:

> Drawing . . . a distinction between authorized domestic sales and authorized foreign
> sales would negate the Supreme Court's stated intent in *Quanta* to eliminate the
> possibility of a patent holder doing an "end-run" around the exhaustion doctrine by
> authorizing a sale, thereby reaping the benefit of its patent, then suing a downstream
> purchaser for patent infringement.

*Id.* at 1046.[6]  In *STMicroelectronics*, the magistrate judge granted summary judgment on SanDisk's patent exhaustion defense—on strikingly similar facts and an almost identical unconditional worldwide license as in the present case—holding that *Jazz Photo* did not stand for the proposition that only sales within the United States can trigger the exhaustion doctrine when there is a valid worldwide license covering the patents-in-suit and the products.  *STMicroelectronics, Inc. v. SanDisk Corp.*, No. 4:05cv45, 2007 WL 951655 at *3 (E.D. Tex. Mar. 27, 2007).[7]  Because the patentee there had given the Toshiba entities a license in "all countries of the world," and "[a]ll countries in the world includes the United States of America," the *STMicroelectronics* court concluded that the Toshiba entities had the "right to [sell] any of the licensed products under the United States Patents. . . in the United States or anywhere in the world."  *Id.* at *3; *see also Sanofi, S.A. v. Med-Tech Veterinarian Prods., Inc.*, 565 F. Supp. 931, 940 (D.N.J. 1983) (recognizing the distinction between a case applying exhaustion "where seller abroad had contractual authority to sell in the United States" and the *Boesch* decision, in which "no exhaustion [applied] where seller abroad had no authority to sell in the United States").

In *Multimedia Patent Trust v. Apple, Inc.* ("*MPT*"), another court distinguished *Fuji* and *Ninestar* on the grounds of a worldwide license to United States patents.  No. 10-CV-2618-H (KSC), 2012 WL 6863471 at *5 (S.D. Cal. Nov. 9, 2012).  There, MPT accused Canon products of infringement based on functionality in Fujitsu chips contained in those products.  *Id.* at *2.

---

[6]  Round Rock relies on the *Medimmune, LLC v. PDL BioPharma, Inc.* decision, rendered prior to the Supreme Court's *Kirtsaeng* opinion.  [*See* Dkt. No. 146 at 6:14–17.]  The *Medimmune* case involved international sales of a patented product from a licensee to its exclusive distributor, which then resold the goods to end users.  No. C 08-5590 JF (HRL), 2011 WL 61191, at *15–*20 (N.D. Cal. Jan. 7, 2011).  The *Medimmune* case is irrelevant to the issues at hand because there the patentee sought compensation only from the licensee/seller based on a patent license requiring a 3% royalty on net sales.  *Id.* at *15.  The licensee had "paid royalties based on its revenue from its sale [of products at a lower price] to [the distributor], rather than [the higher price for distributor's] subsequent sales to third-parties."  *Id.*  The court addressed whether the distributor was a "sublicensee" in order to determine which price to use as the royalty base for the 3% calculation.  *Id.*  Under either calculation, the patentee received only a single reward, which it sought only from the seller/licensee, as opposed to the downstream purchaser.

[7]  While *LG v. Hitachi* and *STMicroelectronics v. SanDisk* were decided prior to the Federal Circuit's *Jazz Photo III* decision (and the Supreme Court's *Kirtsaeng* decision), the Federal Circuit in *Jazz Photo III* was not required to directly address the implications of an overseas sale when the seller has an unconditional worldwide license to sell, import, or otherwise dispose of the products at issue under United States patents.  *See generally Jazz Photo III*, 605 F.3d at 1369–72.

1    However, a prior owner of the asserted patent had entered into a cross-license with Fujitsu that

2    allowed Fujitsu to "make, have made, use, lease, sell and import" products under patents "in any or

3    all countries of the world."  *Id.* at *3.  [*Compare* Dkt. No. 133, Ebertin Decl. Ex. 24 (Micron-

4    Toshiba license) at § 3.1.]  As Round Rock does in this case, the patent owner in *MPT* "argue[d] that

5    Canon's exhaustion defense fails as a matter of law because sales occurring outside of the United

6    States do not exhaust patent rights, relying on the *Jazz Photo* line of cases and *Ninestar*. . . ."  *MPT*,

7    2012 WL 6863471 at *5.  As this Court should do, the *MPT* court distinguished *Jazz Photo* and

8    *Ninestar*, explaining that "those cases only involved foreign sales made directly by the patentee and

9    did not involve sales made pursuant to an unconditional worldwide license."  *Id.* at *5.  In contrast,

10   Fujitsu "was authorized under the '377 Patent to sell Canon the accused chips, and the doctrine of

11   patent exhaustion applies to these sales."  *Id.* at *5.  Here, too, the Toshiba entities are authorized

12   pursuant to an unconditional worldwide license to the patents-in-suit to sell the accused flash

13   memory chips to SanDisk, and patent exhaustion applies to those sales.

14          **4.      Round Rock seeks to establish a system where a patentee can receive
                      multiple rewards for an authorized sale, and where a patentee can impose
15                    post-sale restrictions on an unconditional license.**

16          Applying exhaustion in this litigation would foster the policies set forth in the Supreme

17   Court's exhaustion and first sale jurisprudence.  The Supreme Court has "uniformly recognized that

18   the purpose of the patent law is fulfilled with respect to any particular article when the patentee has

19   received his reward for the use of his invention by the sale of the article, and that once that purpose

20   is realized the patent law affords no basis for restraining the use and enjoyment of the thing sold."

21   *Univis Lens*, 316 U.S. at 251; *see also Masonite*, 316 U.S. at 278.  Here, Micron "received [its]

22   reward" because in exchange for providing a worldwide license to the patents-in-suit to Toshiba,

23   ███████████████████████████████████████████

24          By seeking payment from a downstream customer because the authorized seller exercises a

25   right that it already paid for (i.e., making an authorized sale anywhere in the world), Round Rock

26   attempts an end-run around exhaustion.  However, the Supreme Court has squarely rejected this

27   double-dipping tactic.  Allowing "any downstream purchasers of the system [to] be liable for patent

28   infringement . . . would violate the longstanding principle that, when a patented item is 'once lawfully

made and sold, there is no restriction on [its] use to be implied for the benefit of the patentee.'" *Quanta*, 553 U.S. at 630 (quoting *Adams*, 84 U.S. at 457).  To now require the Toshiba entities to either sell their products directly in the United States (as opposed to in Japan) or else subject their customers to potential infringement liability would effectively impose an impermissible post-sale restriction on the Toshiba-Micron license.  *See id.* at 638.  A finding of no exhaustion in this case would substantially hinder the rights of the Toshiba entities and similarly situated licensees, because:

> an overseas component manufacturer like [the Toshiba entities] would have to possess a distribution network that would allow it to import and sell its component parts in each country where its components might eventually be used and sold by its downstream customers. This would be the only way that the licensee could ensure that its downstream customers would not be later liable for patent infringement. This circumstance is contrary to the licensee's possession [*sic*, of] an unconditional worldwide license to practice the patent.

*See MPT*, 2012 WL 6863471 at *5; *accord Keeler*, 157 U.S. at 666–667 (exhaustion "does not deprive a patentee of his just rights, because no article can be unfettered from the claim of his monopoly without paying its tribute. The inconvenience and annoyance to the public that an opposite conclusion would occasion are too obvious to require illustration."); *Kirtsaeng*, 133 S. Ct. at 1366 (discussing the "intolerable consequences [of applying geographical limitations to copyright first sale doctrine] along with the absurd result that the copyright owner can exercise downstream control even when it authorized the import or first sale").

### D.      The Accused Products Substantially Embody Claims of the Patents-In-Suit.

All of the asserted claims of the '791, '345, and '053 patents are directed to either specific features of a flash memory chip alone, or that chip in combination with a general purpose processor or controller.  The licensed memory chips purchased from the Toshiba entities that are used in the accused SanDisk products possess, or are alleged by Round Rock to possess, all of the claimed features of these three patents.  Thus, as explained above, Round Rock's rights to enforce these patents against SanDisk have been exhausted because the licensed memory chips substantially embody the claims.  Before Round Rock served its expert reports, SanDisk previously provided detailed reasoning as to how Round Rock alleges that the '791, '345, and '053 patents are substantially embodied by the licensed memories, which it incorporates herein. [*See* Dkt. No. 132 at

SanDisk's MSJ re Damages, Exhaustion,
Invalidity and Non-Infringement                    18                    Case No. 11-cv-05243 RS
2355740

11–20; Dkt. No. 219-1.]  Since those briefs, Round Rock's experts have admitted that the licensed flash memory chips substantially embody two of the patents—the '791 and '053 patents.

As to the '791 patent, Round Rock contends that "[a]ll of SanDisk products with a memory chip in the 19, 24, 32, 43, 56nm generations are accused of infringing the '791" patent. [Ex. 4 (Wagner Rept.) at p. 28 ¶ 65; *see also id.* at pp. 126-127 ¶ 424; Ex. 5 (Zeidman Opening Rept.) at p. 47 ¶¶ 124, 126 (same).]  Round Rock's technical expert "agree[s] with Mr. Maltiel's opinion that SanDisk's 19nm-56nm memories *fully or substantially embody* claim 14 of the '791 patent." [Ex. 13 (Zeidman Rebuttal Rept.) at p. 124 ¶ 354 (emphasis added).]  Further, Round Rock accused the memory chips of infringement in its infringement contentions.  [Dkt. No. 186 (Mot. to Am. Inf. Conts.) at Exhibit H1 (chart for '791 patent accusing memory chips).]  Accordingly, Round Rock "cannot [now] claim otherwise." *LG Elecs.*, 655 F. Supp. 2d at 1044.  There is no genuine dispute that the '791 patent is substantially embodied by the licensed flash memories sold to SanDisk by the licensed Toshiba entities.

As to the '053 patent, both Round Rock's expert and its infringement contentions allege that "[a]ll SanDisk products that include memory chips with Toggle mode (24nm and 19nm flash memory chips) or ████████ (including 56nm through 19nm flash memory chips) infringe claim 24 of the '053 Patent." [Ex. 5 (Zeidman Opening Rept.) at p. 39 ¶ 107]; *see also* Ex. 4 (Wagner Rept.) at p. 129 ¶ 434; Dkt. No. 186 at Exhibit L1 (chart for '053 patent, accusing Toshiba memory).]  *See LG Elecs.*, 655 F. Supp. 2d at 1044.  Moreover, Round Rock's technical expert "agree[s] with Mr. Maltiel's opinion that the ████████████████ and the toggle mode features accused of infringement *are substantially embodied* by SanDisk's memories." [Ex. 13 (Zeidman Rebuttal Rept.) at p. 123 ¶ 352 (emphasis added).]  Thus, there is no genuine dispute that the '053 patent is substantially embodied by the flash memories sold to SanDisk by the licensed Toshiba entities.

## V.   CLAIM 14 OF THE '791 PATENT IS INVALID FOR ANTICIPATION.

### A.   Legal and Factual Background

Claim 14 of the '791 patent is directed to a flash memory device that can send or receive data on both the rising and falling edges of a clock signal.  [Ex. 5 (Zeidman Opening Rept.) at p. 29 ¶ 81.]  This feature is known as "double data rate," or "DDR."  However, the use of DDR in flash memory is not new.  In particular, U.S. Patent No. 6,324,602 to Chen ("Chen"), with a priority date of

August 17, 1998 [Ex. 14], expressly discloses a flash memory device that sends and receives data on both the rising and falling edges of a clock signal. Because Chen is undisputedly prior art under 35 U.S.C. § 102(e) and discloses each limitation of claim 14 of the '791 patent, that claim is anticipated as a matter of law.

Round Rock does not dispute that Chen is prior art [*see* Ex. 6 (Zeidman Dep. Tr.) at 249:5–7 (agreeing that the "Chen reference is prior art" to the '791 patent)]. Instead, Round Rock argues that Chen does not anticipate claim 14 of the '791 patent based on its expert's bald assertion that Chen teaches away from using flash memory with DDR circuitry. Chen, however, expressly teaches the ***precise opposite***—that "flash memory" is a "suitable memory" for use with Chen's disclosed DDR circuitry. Expert opinions that contradict the express teachings of the evidence do not create a genuine issue of material fact, and thus summary judgment of invalidity of claim 14 is warranted.

A patent claim is anticipated if any embodiment covered by the claim is disclosed in a "patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent…." 35 U.S.C. § 102(e). Summary judgment is proper if there is no genuine dispute whether the limitations of the claimed invention are disclosed, either explicitly or inherently, by a prior art reference. *See IPXL Holdings, L.L.C. v. Amazon.com, Inc.,* 430 F.3d 1377, 1380–81 (Fed. Cir. 2005). Unsupported conclusions on the ultimate issue of invalidity are "insufficient to raise a genuine issue of material fact." *Dynacore Holdings Corp. v. U.S. Philips Corp.,* 363 F.3d 1263, 1278 (Fed. Cir. 2004). Instead, the opposing party must set forth "specific facts showing that there is a genuine issue for trial" and do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587 (1986).

**B.    Chen Invalidates Asserted Claim 14 of the '791 patent.[8]**

Asserted Claim 14 of the '791 patent recites:

14.  A processing system comprising:
    [1] a processor; and

---

[8]  The scope of SanDisk's Motion for invalidity of the '791 Patent is limited to anticipation of claim 14 by the Chen reference. SanDisk reserves its rights as to its other invalidity assertions, including other asserted claims of the '791 patent, obviousness, and other prior art references.

[2] a double data rate flash memory coupled to the processor comprising:

    [2a] an array of non-volatile memory cells;

    [2b] a clock signal connection to receive a clock signal; and

    [2c] control circuitry coupled to the array to provide two data access operations per clock cycle.

[Dkt. No. 109-7 ('791 patent) at 7:20–8:3.]   Round Rock essentially concedes, as it must, that elements 1 and 2b are expressly disclosed by the Chen patent.  As further demonstrated below, Chen expressly discloses elements 2, 2a, and 2c as well.  Accordingly, claim 14 of the '791 patent is anticipated as matter of law.  [*See* Maltiel Decl. at Ex. A (Invalidity Report) at ¶ 358.]

    **1.**    **It is undisputed that Chen discloses "a processor."**

    Chen discloses using a "microprocessor" for Memory Controller 46 (inside Control Device 14, dashed blue box) [*see* Ex. 14 (Chen) at 7:55–59], and a microprocessor is a "processor." [Maltiel Decl. at Ex. A ¶ 360.]  Round Rock's expert does not dispute this fact in his expert report. [*See* Ex. 13 (Zeidman Rebuttal Rept.) at 76–79, ¶¶ 224–33.]



FIG. 1

    **2.**    **Chen discloses "a double data rate flash memory coupled to the processor."**

    **a.**    **Chen expressly discloses "double data rate . . . memory coupled to the processor."**

Round Rock's expert does not dispute that Chen discloses Memory Device 12 (shown in the

red solid box in annotated Figure 1), which is a type of "memory."  Further, Round Rock's expert does not dispute that Memory Device 12 is "coupled to the" Memory Controller 46 (the claimed "processor") over Memory Bus 22.  [*See* Maltiel Decl. at Ex. A, 135–36 ¶ 361; Ex. 13 (Zeidman Rebuttal Rept.) at 76–79 ¶¶ 224–233.] Thus, there is no dispute that Chen discloses a "memory coupled to the processor."

The "memory" in Chen is "double data rate [DDR] memory."  [Maltiel Decl. at Ex. A ¶ 361.] Memory Device 12 both sends data to and receives data from Memory Controller 46 at DDR over Memory Bus 22 (as shown on Figure 1, above).  [*Id.*]  A component in each of the Memory Device 12 and the Control Device 14 is an advanced input/output (I/O) interface.  [Ex. 14 (Chen) at 5:49–60; 7:44–54; Fig. 1; *see also* Maltiel Decl. at Ex. A ¶ 361, Exhibit C (Reply Report) at ¶¶ 73-75.]  Round Rock's expert agrees that Chen expressly discloses that each of these I/O interfaces can be used to communicate data between the memory and control device on "both the rising and falling edges of a clock signal," labelled CLK in Figure 1.  [*See* Ex. 14 (Chen) at 9:18–23 ("The information in signal $B_k$ can be clocked out of advanced I/O interface 20 at *DDR (i.e., clocked on both the rising and falling edges of a clock signal)*.") (emphasis added)); *see also* Maltiel Decl. at Ex. A ¶ 361; Ex. 6 (Zeidman Dep. Tr.) at 257:7–15 (agreeing that "Chen discloses an interface that clocks data on both the rising and the falling edges of a clock signal").]  Round Rock's expert further agrees that "a DDR interface [is one which] allows data to be accessed on both the rising and falling edge of a clock signal."  [Ex. 5 (Zeidman Opening Rept.) p. 29 ¶ 81.]  Accordingly, there is no disputed issue of fact that Chen discloses "double data rate . . . memory coupled to the processor."

### b.   There is no genuine dispute that Chen discloses "flash memory" as one example of a DDR memory coupled to the processor.

Chen expressly states that one way to implement Memory Device 12 is with "flash memory."

In general, **memory device 12 can be any suitable integrated circuit (IC) memory device including** dynamic random access memory (DRAM), static random access memory (SRAM), non-volatile random access memory (NVRAM), and read only memory (ROM), such as erasable programmable ROM (EPROM), electrically erasable programmable ROM (EEPROM), and **flash memory**, or any other suitable memory.

[Ex. 14 at 4:44–52 (emphasis added).]  Round Rock's own technical expert admits, as he must, that

1    Chen explicitly discloses "flash memory."  [*See* Ex. 6 (Zeidman Dep. Tr.) at 249:5–7 ("A. Flash

2    memory is specifically mentioned there.").]  Nevertheless, he argues that Chen is "insufficient to

3    disclose that flash be configured to operate in a DDR mode."  [Ex. 13 (Zeidman Rebuttal Rept.) at

4    77–78 ¶ 231.]  To support his assertion, Mr. Zeidman completely rewrites the Chen passage quoted

5    above, which Mr. Zeidman interprets as excluding flash memory from the list of "suitable"

6    memories.  [*Id.* at 76–77 ¶ 228.]

7          Mr. Zeidman's rewriting of the Chen reference is wrong and should be disregarded.  The

8    attempt by Round Rock's expert to ignore the explicit disclosure of Chen is both factually and legally

9    incorrect. The plain text of Chen expressly states that the "memory device 12" for use with the

10   invention "can be any suitable integrated circuit (IC) memory device ***including*** dynamic random access

11   memory (DRAM), . . . non-volatile random access memory (NVRAM), [other examples], ***flash***

12   ***memory*** or any other suitable memory." [Ex. 14 (Chen) at 4:44–52 (emphasis added).]  A person with

13   no skill in the art, let alone ordinary skill, would understand clearly that "including . . . flash memory"

14   does not mean "excluding . . . flash memory."  Because Mr. Zeidman directly contradicts what Chen

15   explicitly discloses, Round Rock cannot rely on his opinions to manufacture a genuine issue of material

16   fact.  *See Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1080 (Fed. Cir. 2005) ("[A] party

17   does not manufacture more than a merely colorable dispute simply by submitting an expert declaration

18   asserting that something is black when the moving party's expert says it is white; there must be some

19   foundation or basis for the opinion").

20         Round Rock's attempt to ignore the explicit disclosure of Chen is further incorrect.  The

21   requirement for anticipation is that "[i] a reference must describe, either expressly or inherently, each

22   and every claim limitation and [ii] enable one of skill in the art to practice an embodiment of the

23   claimed invention without undue experimentation."  *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651

24   F.3d 1318, 1341 (Fed. Cir. 2011).  As described above, there is no reasonable dispute as to the first

25   factor because Chen does "expressly" disclose "each and every claim limitation."  Similarly, there is

26   no dispute as to the second factor, because Round Rock's expert conceded that he is not arguing that

27   Chen fails to enable.  [*See* Ex. 6 (Zeidman Dep. Tr.) at 242:21–243:4 ("Q. Your report does not

28   allege that the Chen reference fails to enable its full disclosure, does it? A. No. Q. And you don't

1    intend to testify at trial that the Chen reference is not enable, do you? A. I don't have that

2    intention.').]   Further, Chen is a patent issued by the United States Patent Office, and "when an

3    accused infringer asserts that a prior art patent anticipates specific patent claims, the infringer enjoys

4    a presumption that the anticipating disclosure also enables the claimed invention."   *Impax Labs v.*

5    *Aventis Pharms.*, 545 F.3d 1312, 1316 (Fed. Cir. 2008).

6    **3.      Chen expressly discloses an "array of non-volatile memory cells."**

7           As described in the previous section, Chen does disclose using "flash memory" for Memory

8    Device 12.  It is undisputed that flash memory contains an "array of non-volatile memory cells."

9    [*See* Ex. 13 (Zeidman Rebuttal Rept.) at 76–79, ¶¶ 224–33.]  Indeed, the memory cells in Memory

10   Storage Array 16 (left side of red solid box in Figure 1), would necessarily be non-volatile memory

11   cells if implemented using flash memory.  [*See* Maltiel Decl. at Ex. A ¶ 362; *see also* Ex. 8

12   (Zeidman Opening Rept.) at 23 ¶ 60 (in background section of flash memory, referring to "memory

13   cells on a flash array"), *id.* at ¶ 61 ("Besides a memory array that stores digital information, flash

14   memory requires . . . .").]  Mr. Zeidman further admits that flash memory is a type of "non-volatile

15   memory."  [Ex. 8 (Zeidman Opening Rept.) at 13 ¶ 41.]  Thus, there is no disputed material issue of

16   fact that Chen explicitly discloses an array of non-volatile memory cells.

17   **4.      Chen discloses "a clock signal connection to receive a clock signal."**

18          Round Rock's expert admits that this element is met.  [Ex. 6 (Zeidman Dep. Tr.) at 261:18–

19   21; *id.* at 262:2–7 (admitting "[t]he interface receives a clock signal").]  As shown by the highlighted

20   "CLK" symbol above item 31 of Figure 1 of the Chen patent (marked "PLL Clock Generator"), the

21   disclosed memory device in the Chen patent includes a connection that receives a clock signal.  [*See*

22   Maltiel Decl. at Ex. A ¶ 363; *see also* Ex. 14 (Chen) at 7:31–33 ("PLL clock generator 31 receives a

23   system clock signal as its input and generates a clock (CLK) signal for timing throughout advanced

24   I/O interface 20."); 14:6–12.]

25   **5.      Chen discloses "control circuitry coupled to the array to provide two data access operations per clock cycle."**

26          Round Rock does not dispute that Chen discloses "control circuitry coupled to the array."

27   Indeed, the advanced I/O interface, PLL clock generator, and timing generator and data path circuitry

28   shown in Figure 1 of the Chen patent are coupled to the array.  [Maltiel Decl. at Ex. A ¶ 364, Ex. C

¶¶ 74-75; *see* Ex. 13 (Zeidman Rebuttal Rept.) at 76–79 ¶¶ 224–33.]  This control circuitry provides "two data access operations per clock cycle" (one on the rising edge of the clock signal, and one on the falling edge), thus satisfying this element.  [*See* Maltiel Decl. at Ex. A ¶ 364.]

Because it cannot dispute that Chen expressly discloses operations on both the rising and falling edges of the same clock cycle, Round Rock's expert argues that the Chen patent does not meet this claim limitation because the information sent is "compressed information."  [*See* Ex. 13 (Zeidman Rebuttal Rept.) at 78 ¶ 232.]  However, Round Rock's expert admitted that he is reading extraneous limitations into the claim, because nothing in claim 14 precludes sending compressed information.  [*See* Ex. 6 (Zeidman Dep. Tr.) at 260:5–11 ("Q. . . My question is whether the limitations of claim 1 or 14 excluded compressed data or multilevel data. There is no such limitation, is there, sir?  A. There is no specific limitation in those claims."); 260:25–261:4 ("Q. That is not your opinion, is it, that the claims of the '791 patent exclude compressed data or multilevel data?  A. No."); *see also* Maltiel Decl. at Ex. C at ¶ 74.]  Where a prior art reference discloses each and every limitation of a patent claim, a patentee may not salvage the claim by reading in extraneous, unclaimed features.  *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1360 (Fed. Cir. 2001) (reviewing argument that the prior-art reference "was not a world wide web application" and concluding that the "distinction is irrelevant" since "none of the claims mention either the Internet or World Wide Web"); *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1366 (Fed. Cir. 1999) (prior art "article concerns itself with guinea pig, rather than human, skin, but that difference is irrelevant to the anticipation analysis.  Nothing in the claims limits the method's reach to human skin").  Accordingly, there is no genuine issue of material fact as to whether Chen discloses "two data access operations per clock cycle."  Because the Chen patent discloses each and every element of claim 14 of the '791 patent, that claim is invalid for anticipation as a matter of law.

## VI.    CONCLUSION

For the foregoing reasons, SanDisk requests that the Court grant this motion.

Dated: March 13, 2014

VINSON & ELKINS LLP

By:  ___*/s/ Chuck P. Ebertin*___
Chuck P. Ebertin
Attorneys for Plaintiff and Counterclaim
Defendant, SANDISK CORPORATION

1

**<u>CERTIFICATE OF SERVICE</u>**

2          The undersigned certifies that on March 13, 2014, the foregoing document was filed with the

3  Clerk of the U. S. District Court for the Northern District of California, using the court's electronic

4  case filing system (ECF), in compliance with Civil L.R. 5-1. The ECF sends a Notice of Electronic

5  Filing (NEF) to all parties and counsel who have appeared in this action and who have consented

6  under Civil L.R. 5-1 to accept that NEF as service of this document.

7

8                                        */s/ Chuck P. Ebertin*
                                          Chuck P. Ebertin

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28